James H. LANE, et al., Plaintiff,

v.

CHAMPION INTERNATIONAL
CORP., et al., Defendants.

Civ. A. No. 92–01043–RV–S.

United States District Court,
S.D. Alabama, S.D.

June 14, 1993.

Richard A. Freese, Birmingham, AL, Mary E. Murchison, Foley, AL, J. Alan Cox, Tallahassee, FL, Bayless E. Biles, Bay Minette, AL, for plaintiff.

G. Sage Lyons, Mobile, AL, W. Kyle Carpenter, Knoxville, TN, Shelia L. Birngaum, New York City, for defendants.

### ORDER

VOLLMER, District Judge.

This matter is before the court on defendant Owenby's "motion to dismiss for lack of personal jurisdiction" (tab 5; *see also* tabs 6, 8, and 9), defendant Champion's brief in support of this court's jurisdiction (tab 7), plaintiffs' "motion to remand" and incorporated response to defendant Owenby's motion to dismiss (tab 23; *see also* tab 24), defendants' reply brief in support of defendant Owenby's motion to dismiss and responsive brief in opposition to plaintiffs' motion to remand (tab 25), and defendants' "response to plaintiffs' submittal of *Charest v. Olin Corp.*" (tab 30). After due and proper consideration of the foregoing, and of the arguments of counsel for the parties that were presented during the May 3, 1993, hearing in this action, the court concludes, for the following reasons, that this action is due to be **REMANDED** to the Circuit Court of Baldwin County, Alabama.

### Background

■ Plaintiffs, James and Jacqueline Lane (the "Lanes") and Eugenia Elebash ("Elebash"), owners of land located on Perdido Bay in Baldwin County, Alabama, initiated this action in Baldwin County Circuit Court[1] against defendants Champion International Corporation ("Champion") and Douglas Owenby ("Owenby"), alleging state law violations[2] arising out of defendant Champion's release of dioxins into a waterway (*i.e.*, Eleven Mile Creek in Florida) leading into Perdido Bay.[3] At all times material to this action, Champion operated a pulp and paper mill in Cantonment, Florida, approximately five miles east of the Alabama state line. The mill is located on Eleven Mile Creek, approximately ten miles north of Perdido Bay. At times material to this action, Owenby worked as Vice–President, Operations Manager of the Cantonment mill. Plaintiffs seek injunctive relief and monetary damages exceeding $50,000, exclusive of interest and costs.

Defendants timely and jointly removed this action to federal court pursuant to 28 U.S.C.

---

1. The Lanes and Elebash purport to represent a class of individuals, all of whom own land on Perdido Bay and have been or are being damaged by Champion's release of dioxins. Plaintiffs have named as defendants numerous fictitious parties whose identity and citizenship shall be disregarded by this court in considering the presently-pending motions. *See* 28 U.S.C. § 1441(a).

2. Plaintiffs attempt to state claims for negligence, wantonness, breach of duty to warn, fraud, misrepresentation, deceit, nuisance, trespass, battery, assault, negligent infliction of emotional distress, intentional infliction of emotional distress, outrage, and strict liability. Pursuant to

*International Paper Co. v. Ouellette*, 479 U.S. 481, 501, 107 S.Ct. 805, 816, 93 L.Ed.2d 883, 902 (1987), in which the Supreme Court held that the trial court "must apply the law of the State in which the [source of the alleged pollution] is located" in cases arising out of the discharge of effluents in navigable waterways, the substantive law of Florida—the source state—will govern this case.

3. The court takes judicial notice of the fact that Perdido Bay is situated on the Alabama and Florida state lines.

§ 1441. In so doing, they sought to invoke this court's subject matter jurisdiction, contending that complete diversity of citizenship exists between the plaintiffs and the only appropriately-joined defendant—Champion. The Lanes are Florida residents, and plaintiff Elebash is a resident of Alabama. Defendant Champion is a corporation organized and existing under New York law and maintains its principal place of business in Connecticut. Defendant Owenby is a Florida resident.

Addressing the apparent lack of diversity of citizenship between defendant Owenby and the Lanes, defendants contend that Owenby is due to be dismissed for two reasons: first, plaintiffs have failed to and, indeed, cannot state a claim for relief against him (that is, there is and can be no basis in fact or law supporting a recovery against him "on any alleged basis pleaded or otherwise"), and, second, this court and the Alabama state courts lack personal jurisdiction over him. Plaintiffs challenge the defendants' contentions, asserting both that they have stated valid claims for relief against Owenby and that this court has personal jurisdiction over him.

Immediately following removal, Owenby filed a motion to dismiss for lack of personal jurisdiction (tab 5; *see also* tabs 6, 8, and 9). Additionally, Champion filed a brief in support of this court's jurisdiction (tab 7), addressing therein the contention that plaintiffs have failed to state a claim for relief against Owenby. After allowing the parties a period of discovery limited solely to the jurisdictional issues raised by Owenby and Champion, the plaintiffs filed a "motion to remand" (tab 23; *see also* tab 24), and an incorporated response to Owenby's motion to dismiss. The court conducted oral argument on May 3, 1993, on the motions to dismiss and to remand. Both motions are now ripe for this court's consideration.

### Discussion

### A. Scope and Substance of this Court's Consideration

At the outset, the court notes that there is some disagreement between the parties concerning this court's obligation to consider both the "failure to state a claim" and "lack of personal jurisdiction" contentions presented by the defendants. The defendants cast their two arguments supporting this court's diversity jurisdiction under the "fraudulent joinder" rubric; that is, they assume that this court should and must consider both issues in determining whether this action is properly before the court. Their assumption is premised on an expansive view of fraudulent joinder jurisprudence and notions of judicial economy, and appears to presume that the "no possibility of recovery" prong of the fraudulent joinder analysis, *see infra* at pages 705–07, incorporates consideration of whether the state court could render a valid judgment against the defendant under the due process clause of the fourteenth amendment. *See Martino v. Viacao Aerea Riograndense, S.A.*, 1991 W.L. 13886 (E.D.La. Jan. 25, 1991) (court "asked to review personal jurisdiction to determine whether plaintiffs could succeed in the court of the particular state," as opposed to the traditional fraudulent inquiry, questioning whether the plaintiffs could obtain "success purely on the subject matter"); *see also Villar v. Crowley Maritime Corp.*, 780 F.Supp. 1467 (S.D.Tx. 1992), *aff'd*, 990 F.2d 1489 (5th Cir.1993); *Nolan v. The Boeing Co.*, 736 F.Supp. 120 (E.D.La.1990); *Acker v. Armstrong World Industries, Inc.*, 1989 W.L. 268344 (S.D.Miss. Dec. 1, 1989).

Plaintiffs maintain that only the failure to state a claim issue is an appropriate subject of the fraudulent joinder analysis in this case. They assert that the personal jurisdiction issue is one that this court, in the exercise of its discretion, *may*, but ought not, consider.

As will be discussed, the doctrine of fraudulent joinder most often addresses those situations in which there has been outright fraud in the content of plaintiff's pleading of jurisdictional facts, or in which one can say no possibility exists that the plaintiff would be able to establish a viable cause of action against the non-diverse defendant in state court. In this case, it is urged that there is no possibility that Owenby could be held liable to the plaintiffs not only because the plaintiffs assertedly cannot establish a viable cause of action against him, but also because

the Alabama state court could not exercise personal jurisdiction, and thus could not render a valid judgment against, him.

In the typical fraudulent joinder case, a resident plaintiff attempts to destroy diversity, and thereby defeat removal, by bringing a state court action against both a resident and a nonresident defendant. Since the nondiverse defendant is a citizen of the forum state in such instances, there is no question that such defendant is subject to personal jurisdiction. Thus, to establish fraudulent joinder the removing party must demonstrate that the court lacks subject matter jurisdiction over the claim against the nondiverse defendant because the plaintiff could not possibly prevail, on the merits, in state court. In such a case, the court must determine whether the law might impose liability on the resident defendant, and the court frequently considers the plaintiff's motion to remand in conjunction with the resident defendant's motion to dismiss. The conceptual inquiry prompted by both such motions ordinarily deals with a kind of substantive guess about the merits of the claim urged against the resident, and the general question for the court to resolve is whether there is any possibility that the plaintiff might be able to establish liability against the so-called fraudulently joined defendant. If the answer to the court's inquiry is yes, the joinder is not condemned as fraudulent.

Because the fraudulently joined defendant is usually a resident of the state in which suit is brought, the question of the court's personal jurisdiction over the resident defendant does not arise. The pivotal inquiry goes directly to subject matter jurisdiction. That is not so in this case. Here, because the Lanes are Florida residents and have named as a defendant Owenby, who also is a Florida resident, it is the naming of a nonresident defendant, and not a resident defendant, that destroys diversity. The court's personal jurisdiction over the nonresident defendant thus becomes one focus of inquiry.

This case differs from the better-known fraudulent joinder cases because Owenby maintains that there is no possibility that plaintiffs case establish liability against him—not only because plaintiffs are impeded from invoking a serious cause of action against him—but *also* because plaintiffs cannot establish that Owenby is subject to personal jurisdiction in Alabama. Thus, although the usual case focuses directly and only on subject matter jurisdiction in the remand context, here both personal jurisdiction *and* plaintiffs' claims against Owenby directly implicate the court's remand authority.

Plaintiffs urge the court to reach the motion to remand first. According to plaintiffs, what the Court must determine is whether there is any reasonable basis for predicting that they could succeed in establishing liability against Owenby under Florida law. They seek to track strictly the traditional fraudulent joinder analysis and to have this court eschew consideration of personal jurisdiction as a component of this court's jurisdiction.

■ It is within this court's discretion to determine whether it will consider the motion to dismiss (for lack of personal jurisdiction) prior to addressing plaintiffs' motion to remand. *See Walker v. Savell*, 335 F.2d 536 (5th Cir.1964)[4,5] The court, in the exercise

---

4. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals that were rendered prior to October 1, 1981.

5. In *Walker*, the plaintiff, a Mississippi resident, filed a libel suit in Mississippi state court against the Associated Press ("AP"), a non-resident of the forum state, and Van Savell, a Mississippi resident. The defendants removed the action to federal court, seeking to invoke the court's federal question jurisdiction. [Defendants contended that plaintiffs stated a federal claim for relief against Savell, but not AP.] Defendant AP thereafter filed a motion to dismiss or to quash service of process on the ground that it was not doing business in Mississippi and, therefore, was not subject to process therein. Following plaintiff's filing of a motion to remand, the district court notified the parties of its intention to rule on the motion to dismiss, prior to considering the motion to remand.

Over plaintiff's objection, the motion to dismiss was considered first and granted, thus eliminating AP from the case. This court assumes that the motion to remand was denied as moot following that action. Plaintiff appealed the dismissal order, principally arguing that the trial court erred in resolving the motion to dismiss prior to the motion to remand.

of its discretion, concludes that notions of judicial economy, fairness, and equity—all of which underlie the relegation of such broad discretion in these circumstances—all support this court's decision *not* to resolve the personal jurisdiction issue. The court believes, based on the evidentiary materials submitted by the parties and on its review of the applicable law, that the plaintiffs have made a prima facie showing that an Alabama court could exercise specific personal jurisdiction over Owenby. *See Rittenhouse v. Mabry,* 832 F.2d 1380, 1382 (5th Cir.1987). Rather than make that ultimate determination, however, the court believes it best for the Alabama state court, on remand, to do so.

Were this court to deny Owenby's motion to dismiss and grant plaintiff's motion to remand, the state court very likely would be in the position of having to assess the propriety of this court's resolution of the personal jurisdiction issue.[6] Such a result would be counter to notions of federalism and belie notions of judicial economy. This court is aware that Champion would be unable to remove this action if the state court, on remand, were to grant Owenby's motion to dismiss. *See Weems v. Louis Dreyfus Corp.,* 380 F.2d 545, 545–49 (5th Cir.1967) (invoking the "voluntary/involuntary" rule, which bars removal after dismissal of a nondiverse defendant unless the dismissal was voluntarily made by the plaintiff). The court is confident, however, that Champion will be able to

receive a fair trial in state court, even in the unlikely event that the state court determines that Owenby is due to be dismissed for lack of personal jurisdiction. Should the state court deny Owenby's motion to dismiss, Owenby will be able to challenge that ruling on direct appeal.

## B. Removal and the Principle of Fraudulent Joinder

### ■ 1. *Scope and standard of review.*—

In relevant part, section 1441(a), 28 U.S.C. provides:

> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.[7]

As the right of removal is purely statutory, the statute must be strictly construed to limit federal jurisdiction. *Harris v. Huffco Petroleum Corp.,* 633 F.Supp. 250 (S.D.Ala.1986).

Article III, § 2 of the United States Constitution extends the federal judicial power to controversies "between Citizens of different States"—so-called "diversity of citizenship" cases. Under the principle set forth in the Supreme Court's decision in *Strawbridge v.*

Affirming the district court's actions, the Fifth Circuit Court of Appeals observed:

> Where, as here, the attack on jurisdiction is as to the amenability of defendant to process rather than an attack on jurisdiction over the subject matter, we conclude that the federal court had a right to consider the motion to quash service and determine the jurisdictional question before remanding the case to the state court. If the appellee was not amenable to service of process this could properly be decided before the court took any further action on the motion of the appellant in the nature of a motion for remand.

> \*  \*  \*  \*  \*  \*

> Since this case was, under the terms of the removal statute, unquestionably in the district court even though later subject to a proper motion to remand, if a suit could properly be pending anywhere, once it became apparent by the filing of the motion to quash service of process that there was a question raised by the defendant below whether it could properly be

brought into court in Mississippi under any circumstances, it was proper for the trial court to examine into this question immediately and not subject the defendant, so protesting, to a further hearing on the motion to remand and possibly to a further hearing in a state court where it would then have to raise once again the question of personal jurisdiction. Once appellee lodged in the district court its challenge to the jurisdiction *in personam,* it was entirely appropriate for that court to inquire into, and resolve, that issue.

6. The court notes that Owenby could request an interlocutory appeal of this court's denial of his motion to dismiss. *See Allen v. Ferguson,* 791 F.2d 611 (7th Cir.1986). The court, however, would be disinclined to permit such an appeal.

7. Subsection (b) of 28 U.S.C. § 1441 authorizes the removal of cases based on diversity if none of the defendants is a citizen of the state in which the action is brought.

*Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), diversity of citizenship exists, for purposes of federal jurisdiction, whenever all of the plaintiffs are of different citizenship than all of the defendants. Federal district courts are granted original jurisdiction over diversity cases in which the amount in controversy exceeds $50,000, exclusive of interest and costs. 28 U.S.C. § 1332.

▉▉▉ Defendants in a state court action, not all of whom are of different citizenship than the plaintiff or plaintiffs, may remove the action to federal district court and seek to invoke the federal court's diversity jurisdiction by contending that the non-diverse defendant or defendants were not properly joined as defendants in state court. In such cases, the removing parties bear the burden of proving that the non-diverse defendants were "fraudulently joined"—that is, either that "there is *no possibility* that the plaintiff would be able to establish a cause of action against the [non-diverse] defendant[s] in state court or that there has been outright fraud in the plaintiff's pleading of jurisdictional facts"—*Coker v. Amoco Oil Co.,* 709 F.2d 1433, 1440 (11th Cir.1983) (emphasis added), and, thus, of establishing their right to invoke federal jurisdiction. The term embraces the joinder of defendants against whom a plaintiff cannot state a claim for relief or obtain a recovery. *See Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1561 (11th Cir.1989); *see also Draper v. Castle Home Sales, Inc.,* 711 F.Supp. 1501, 1503 (E.D.Ark.), *aff'd,* 894 F.2d 1341 (8th Cir. 1989). "If there is even a possibility that the state court would find that the complaint states a cause of action against the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Coker,* 709 F.2d at 1440–41. The citizenship of a fraudulently joined defendant may be disregarded in determining whether diversity jurisdiction exists. *See Cabalceta,* 883 F.2d at 1561; *Lailhengue v. Mobil Oil Corp.,* 775 F.Supp. 908, 910 (E.D.La.1991).

▉▉▉ "The burden on the defendant [in establishing fraudulent joinder] is high; its presentation must be one that 'compels the conclusion that the joinder is without right and made in bad faith....'" *Frontier Airlines, Inc. v. United Airlines, Inc.,* 758 F.Supp. 1399, 1404 (D.Colo.1989) (quoting *Chesapeake & Ohio Ry. Co. v. Cockrell,* 232 U.S. 146, 152, 34 S.Ct. 278, 280, 58 L.Ed. 544, 547 (1914)). A claim that joinder is fraudulent must be asserted with particularity and supported by clear and convincing evidence. *Parks v. New York Times Co.,* 308 F.2d 474, 478 (5th Cir.1962), *cert. den.,* 376 U.S. 949, 84 S.Ct. 964, 11 L.Ed.2d 969 (1964); *Katz v. Costa Armatori, S.P.A.,* 718 F.Supp. 1508, 1510 (S.D.Fla.1989).

▉▉▉ Both parties may submit affidavits and/or deposition transcripts on a motion to remand. *Coker,* 709 F.2d at 1440; *see Frontier Airlines,* 758 F.Supp. at 1404; *McCabe v. General Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir.1987). To give rise to a possibility of recovery against a non-diverse defendant, a plaintiff need only present affidavits or other evidence controverting facts set forth in defendants' submissions. The court must resolve all disputed issues of fact and law in favor of the plaintiff. *Coker,* 709 F.2d at 1440. Although plaintiffs' responsive burden may require the presentation of factual materials in support of the complaint, the burden on the plaintiffs is not as high as that which is imposed on a party resisting summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

▉▉▉ The expression "fraudulent joinder" is somewhat a term of opprobrium, implying nefarious or malicious intent on the part of the plaintiffs. *See Katz,* 718 F.Supp. at 1513 (citing *Harrell v. Reynolds Metals Co.,* 599 F.Supp. 966, 967 (N.D.Ala.1985)). In proving "fraudulent joinder," however, the focus is *not* necessarily on the plaintiff's subjective intent or motive in including the non-diverse defendant(s). Although the former Fifth Circuit Court of Appeals has stated that "bad faith" on the part of the plaintiff is necessary, *see Parks,* 308 F.2d at 478, that court also recognized that constructive evidence of such "intent"—as, for example, in instances in which the plaintiff should have known that a recovery against the non-diverse defendant would have been impossible—may be suffi-

cient. "Joinder of a defendant is not fraudulent simply because the motive is to defeat diversity." *Schwegmann Bros. Giant Super Markets v. Pharmacy Reports, Inc.*, 486 F.Supp. 606, 614 (E.D.La.1980) (citing *Parks v. New York Times Co.*, 308 F.2d 474 (5th Cir.1962)). If plaintiffs' allegations set forth a good faith claim under state law, no matter how doubtful, the presence of the non-diverse defendant will prevent removal. *See Tedder v. F.M.C. Corp.*, 590 F.2d 115, 116–17 (5th Cir.1979).

■ A court should use a proceeding similar to that which is used for ruling on a motion for summary judgment in resolving a claim of fraudulent joinder. *See Veltmann v. Crowley Maritime Corp.*, 784 F.Supp. 366 (E.D.Tex.1992) (citing *Carriere v. Sears, Roebuck and Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. den.*, 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990)). Taking into consideration the heavy burden placed on the defendants, this court first must determine whether the defendants have proven by clear and convincing evidence that there is no possibility that the plaintiffs could obtain a judgment against the Owenby in state court. Assuming that the defendants satisfy their initial burden, the burden then shall shift to the plaintiffs to establish, at the very least, that genuine issues of fact or law exist concerning the appropriateness of Owenby's joinder in this case.

**2. *Plaintiffs' contentions against Owenby.*—**Plaintiffs have made the following allegations against Owenby:

(1) Defendant, Doug Owenby ("Owenby"), is an individual and the plant manager for Champion at its Cantonment Pulp and Paper Mill at Cantonment, Florida. Owenby is, on information and belief, a resident citizen of the State of Florida and had the responsibility, duty and right to monitor, control, maintain and supervise the discharge in emissions of pollutants, wastes and water from Champion's said pulp and paper mill into Eleven Mile Creek and Perdido Bay. The acts alleged against Owenby were done within the line and scope of his employment with Champion International Corporation.

(2) Defendant Owenby knowingly and intentionally discharged hazardous substances into Eleven Mile Creek and Perdido Bay and defendants Owenby and Champion continue to release these hazardous substances into Eleven Mile Creek and Perdido Bay.

(3) Defendant Owenby knowingly concealed knowledge of the dangers that these hazardous substances have on human life and health, animal life and the general environment, and therefore, defendant Owenby negligently failed to warn the plaintiffs of these dangerous conditions.

(4) Defendant Owenby knew or should have known that the release of these hazardous chemicals would pollute Eleven Mile Creek and Perdido Bay and would thus enter the food chain. Additionally, defendant Owenby knew or should have known that these hazardous substances are inherently dangerous to human health and the environment.

Amended Complaint, ¶¶ 5, 13, 15, 17. Defendants characterize plaintiffs' complaints as focusing on the design and construction of Champion's mill to manufacture bleached kraft pulp—matters that are asserted to predate by several years Owenby's involvement with the mill and are "clearly beyond [Owenby's] authority to alter." The defendants also note that dioxin, which plaintiffs claim is produced by the chlorine bleaching process at the mill, has not been detected in the mill's effluent since Owenby became Operations Manager. Plaintiffs, it is asserted,

seek to hold Owenby liable for purely administrative functions performed by [him] in overseeing the day-to-day operations of the mill, as a basis of liability not permitted under applicable state law. By the slender thread of their informed—but erroneous—belief that the character of the Cantonment mill effluent is within Owenby's control, plaintiffs have attempted to tie Owenby to this action solely to prevent Champion from exercising its right to remove the action to federal court.

Taken after defendants' submission of Owenby's affidavit in this action, Owenby's depo-

sition sheds significant light on Owenby's relevant activities at the Cantonment mill. According to Owenby's testimony, Owenby has been employed by Champion's Cantonment mill since February 1990. The mill employs approximately 1,060 people, and Owenby is in the top supervisory position over all of those employees. Owenby is in direct responsible charge for the facility and is also responsible for carrying out the policies and procedures of Champion on a day-to-day basis. Furthermore, he is the highest ranking employee of Champion in the entire State of Florida.

At the time Owenby came to the Cantonment mill, the mill was producing kraft paper and pulp products. During the production process, the mill used, and continues to use, molecular chlorine as a bleaching agent. For at least several years now, Owenby has been aware that concentrations of dioxin may be created in the bleaching process when molecular chlorine is used, and he has discussed the issue of dioxin formation caused by the bleaching process with other Champion employees.

Since February 1990, Owenby has personally overseen the activities at the Cantonment mill in carrying out a dioxin minimization program created by Champion. Specifically, Owenby has directly overseen efforts by Champion to substitute chlorine dioxide for elemental chlorine, the primary component in Champion's bleaching process. He also has personally overseen the operation of defoamers, in an effort to ensure that the defoamers are not aiding in the formation of dioxin. Owenby admits that dioxin may be present in the effluent created during the production process at the mill, notwithstanding these precautionary measures.

Owenby is aware (i) that the outfall for Champion's effluent at the Cantonment mill is located on Eleven Mile Creek, (ii) that Eleven Mile Creek runs into Perdido Bay, and (iii) that Perdido Bay borders on the State of Alabama. He also is aware of the plaintiffs' contention that effluent from Champion's operations at the Cantonment mill contains dioxin.

The department at the mill responsible for establishing environmental safeguards is the Environmental Health and Safety Department ("EHSD"). The activities of the EHSD ultimately are reported to Owenby, and it is his responsibility to oversee and supervise that department. In that regard, he attends monthly meetings of the EHSD. The subject of dioxin at the Cantonment mill has been discussed at those meetings.

During EHSD meetings, Owenby has received reports of citizen complaints concerning the dioxin created by Champion's mill. It ultimately is Owenby's responsibility, as operations manager, to see that Champion deals with the citizen complaints that are directed toward the operation of the mill. To that end, he has personally directed the head of the EHSD to respond to the citizens' concerns by communicating Champion's efforts to minimize the formation of dioxin, and he had direct input into the responses that were in fact made to the complaints that had been registered with Champion.

In addition to complaints concerning dioxin, Owenby is aware that residents from surrounding areas have complained about excess amounts of foam on Eleven Mile Creek and in Perdido Bay. He also is aware that others in the surrounding areas have complained about noxious odors created by the operation of Champion's mill. Finally, Owenby is aware of complaints that Champion's operations at the Cantonment mill have caused algae accumulation in Perdido Bay. Owenby has the authority to investigate whether Champion was responsible for causing the presence of algae in Perdido Bay, yet he personally has done nothing to see that such investigations are performed.

Although the affidavits submitted by the defendants suggest otherwise, Owenby conceded in deposition that, as operations manager of the mill, he has the authority to determine when equipment at the mill should be repaired or replaced. Similarly, with respect to the operation of mill equipment, certain modifications can be made to the bleaching process conducted at the mill. These changes are authorized by various department heads at the mill, all of whom report directly to Owenby. Moreover, although it is the head of the operating depart-

ment at the mill who determines how much chlorine or chlorine dioxide is used in the bleaching process, Owenby has the ultimate authority, as operations manager, to decide matters concerning the fluctuation or alteration of the chemical bleaching process at the mill, including the amount of chlorine used in that process.

Champion discharges approximately 20 million gallons of effluent per day into Eleven Mile Creek.[8] It is Owenby's responsibility to oversee the smooth flowing of the effluent discharge and to ensure that Champion complies with all of its discharge permits. Given this responsibility, if Owenby determined that a problem existed with dioxin levels in the effluent, it would be his responsibility to eliminate the dioxin problem. In other words, it ultimately is Owenby's responsibility to ensure that positive readings of dioxin are not found in wastewater discharged from the mill.

Owenby has the authority to shut down the Cantonment mill in the case of an emergency.[9] In that regard, Owenby testified that he has the authority in the event of a discharge of a toxic substance into Eleven Mile Creek or into Perdido Bay to take immediate corrective action, which could include totally shutting down operations at the mill. Indeed, Owenby stated that he had the authority to take immediate corrective action to prevent Champion's pollution of the creek and of Perdido Bay and to reduce whatever harmful effects might result from the disposal of toxic substances into those waterways. Moreover, if Owenby determined that an emergency situation occurred at the plant whereby harm could be caused to wildlife, human life, or property, he could take corrective actions to remedy that situation. For example, if Owenby was personally satisfied that the Cantonment mill was dumping hazardous material into Eleven Mile Creek that could harm wildlife, he could take corrective action in the mill to prevent such materials from getting into the creek.

Plaintiffs aver that Owenby knew or should have known of studies, undertaken by the Environmental Protection Agency and the American Paper Institute, concerning the dangerous health effects of dioxin were made known. Additionally, it is alleged that he knew or should have known that Champion was charging dioxins and other toxic substances into Eleven Mile Creek and Perdido Bay, and that positive levels of dioxin have been detected in fish found below Champion's effluent outfall on Eleven Mile Creek. Owenby, it is charged, concealed this knowledge and information from the plaintiffs and made no attempt to warn plaintiffs of the health and property risks resulting from exposure to dioxins and other toxic substances released by Champion.

*3. Law governing plaintiffs' claims against Owenby.*—The parties in this case essentially agree on the law applicable to Owenby's alleged liability, but disagree that Owenby, under the unique facts of this case, is or could be liable to these plaintiffs. In determining whether a cause of action may be established against an alleged fraudulently joined defendant in a diversity case, the court must look to the law of the state that controls the substantive issues in the action. *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1562 (11th Cir.1989). In this case, Florida law is controlling. *See supra* at note 2.

Under Florida law, an employee of a corporation may not be held liable for alleged torts committed by the corporation "merely by reason of his official character." *Orlovsky v. Solid Surf, Inc.*, 405 So.2d 1363, 1364 (Fla.Ct.App.1981). Rather, before a corporate employee may be held liable, four prerequisites must be satisfied:

(1) The corporation must owe a duty of care to the third person, breach of which has caused the damage for which recovery is sought;

8. Champion is the only pulp and paper mill with operations on Eleven Mile Creek or the Perdido River.

9. Apparently, it is up to Owenby to decide on his own when an emergency situation occurs, since

there are no written documents at the Cantonment mill which define circumstances under which an emergency situation could be said to exist.

(2) The duty must have been delegated by the employer to the defendant officer;

(3) The defendant officer must have breached this duty through personal—as opposed to technical or vicarious—fault; and

(4) With regard to the personal fault, personal liability cannot be imposed upon the officer simply because of his general administrative responsibility for performance of some function of his employment. He must have a personal duty towards the injured third person, breach of which specifically has caused the person's damages.

*McElveen v. Peeler,* 544 So.2d 270, 272 (Fla. Ct.App.1989).

In this case, defendants assert that at least three of the *McElveen* requirements have not been, and cannot be, satisfied. Initially, they maintain, even if a duty was owed by Champion to the plaintiffs and that duty was breached, it was not a duty that was delegated by Champion to Owenby. Next, they maintain that plaintiffs have failed to allege any specific acts on the part of Owenby that could give rise to his personal liability. Thus, defendants assert,

> even if Owenby owed a personal duty to plaintiffs, his *individual* conduct (as opposed to the conduct of the corporation or other corporate employees) did not result in a breach of that duty. Plaintiffs have not alleged, and cannot show, any act on Owenby's part that caused them injury. As a result, the third prong of the *McElveen* test is not satisfied. Indeed, it is apparent from the face of the complaint that plaintiffs seek to predicate Owenby's liability not on any individual breach of duty by Owenby, but upon his general administrative responsibilities at the mill— which under the fourth prong of the *McElveen* test, Florida law does not recognize as a valid basis of liability.

Bearing in mind, as this court must, the exceedingly high burden imposed on the defendants in attempting to establish the fraudulent joinder of Owenby, and resolving, also as this court must, all factual and legal disputes in favor of the plaintiffs, the court concludes that the unique circumstances of this case do not support defendants' charge of fraudulent joinder. Framed otherwise, it is clear that the defendants have not established by clear and convincing evidence that the plaintiffs cannot establish a cause of action against Owenby in his individual capacity. Even if this court were to conclude that the defendants had satisfied their initial burden of showing, by the affidavits submitted by them during the course of these proceedings, that the plaintiffs could not predicate liability against Owenby under the factors enumerated in *McElveen,* the court nevertheless would conclude that the deposition testimony adduced by the plaintiffs in support of their motion to remand interjects sufficient factual and legal disputes to rebut defendants' prima facie showing and support this court's ultimate rejection of defendants' fraudulent joinder contention.

Without speculating on plaintiffs' ultimate chances of success on their claims against Owenby, the court notes that there are substantial questions of disputed fact concerning Owenby's asserted liability under *McElveen.* First, defendants do not dispute that Champion owes a duty of care to the plaintiffs with respect to the claims asserted in the amended complaint. Second, it appears, from the facts adduced by the plaintiffs, that Champion may have delegated this duty to Owenby, in his capacity as vice president, operations manager at the Cantonment mill. At the very least, a question of fact exists as to whether it has done so. Owenby's deposition testimony, too, could support the ultimate factual conclusions that Owenby had personal, as opposed to vicarious, involvement with the claims asserted against him and that he personally breached a duty that was owed to the plaintiffs.

### Conclusion

In light of the foregoing, the court pretermits consideration of Owenby's motion to dismiss and, further, concludes that plaintiffs' motion to remand is due to be, and hereby is, **GRANTED.** This action is hereby **REMANDED** to the Circuit Court of Baldwin County, Alabama.